**STINSON LLP**
ROBERT T. KUGLER (Minn. Bar No. 194116)
robert.kugler@stinson.com
EDWIN H. CALDIE (*pro hac vice*)
ed.caldie@stinson.com
CLARISSA C. BRADY (*pro hac vice* pending)
clarissa.brady@stinson.com
50 S 6th Street, Suite 2600
Minneapolis, Minnesota 55402
Telephone: (612) 335-1500

**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
JANE KIM (Cal. Bar No. 298192)
(jkim@kbkllp.com)
GABRIELLE L. ALBERT (Cal. Bar No. 190895)
(galbert@kbkllp.com)
650 California Street, Suite 1900
San Francisco, California 94108
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Counsel for the Official Committee of Unsecured Creditors*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SANTA ROSA DIVISION

| | |
|---|---|
| In re:<br><br>THE ROMAN CATHOLIC BISHOP OF SANTA ROSA<br><br>Debtor. | Case No. 23-10113 (CN)<br><br>Chapter 11 Bankruptcy |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,<br><br>Plaintiff,<br>v.<br>THE ROMAN CATHOLIC BISHOP OF SANTA ROSA, a corporation sole,<br><br>Defendant. | Adv. Pro. No.<br><br>**ADVERSARY COMPLAINT FOR DECLARATORY RELIEF** |

The Official Committee of Unsecured Creditors ("<u>Committee</u>") alleges as follows upon knowledge with respect to itself, and upon information and belief as to all other matters:

# INTRODUCTION

1. The Committee represents the interests of hundreds of individuals who were abused as children by priests or laypersons within the Roman Catholic Bishop of Santa Rosa (the "Debtor" or the "Diocese"). The Committee seeks declaratory relief to make clear that assets titled in the Debtor's name, i.e., titled in the name of the Roman Catholic Bishop of Santa Rosa repose in the Roman Catholic Bishop's bankruptcy estate.

2. This case does not take place in a vacuum. The Catholic Church has developed a coordinated, international strategy to address its child sex abuse crisis; that strategy is being directed to some degree by individuals outside the dioceses; and the Debtor in this case is an integrated part of a broader, coordinated plan to minimize Church liabilities relating to those it abused.[1]

3. Bankruptcy jurisprudence frequently refers to the concept of a "fresh start." But it is important to define that concept in this unique case. The Diocese is not a typical bankruptcy debtor, but its status as a religious organization has nothing to do with its uniqueness. This bankruptcy case was not necessitated by the Diocese's religious history or status. The reason for this bankruptcy filing was the Diocese's decades-long refusal to be transparent regarding the material role it played in the pervasive sexual abuse of a devastating number of children.

4. For an authentic "fresh start" to occur, the Diocese's history of obfuscation must be set aside in favor of authentic, thorough transparency. And such transparency must extend to the finances and dealings of any party that wishes to obtain bankruptcy-equivalent relief (i.e., a third-party release or the benefit of a channeling injunction). Having elected to seek bankruptcy protection voluntarily, the Diocese chose to assume an obligation to comply fully with applicable laws and rules, and it should not be provided any accommodation or consideration that would not be afforded equally to any other debtor.

---

[1] *See* Greg Moran, *Roman Catholic Diocese of San Diego accused of fraudulently transferring assets to foil sex abuse liability*, LOS ANGELES TIMES, Feb. 23, 2023 at 7:42 a.m. PT, https://www.latimes.com/california/story/2023-02-23/roman-catholic-diocese-sued-assets; Kevin J. Jones, *New global Catholic rules against sex abuse build on decades of work*, CATHOLIC NEWS AGENCY, May 31, 2019 at 14:05 p.m., https://www.catholicnewsagency.com/news/41431/new-global-catholic-rules-against-sex-abuse-build-on-decades-of-work.

5. If any consensual resolution is to be found, the process must be scrupulously thorough and unwaveringly fair. The Church's error in the past was prioritizing its financial and reputational health above the safety and sanctity of children in its community. That error was made worse by the Church's decades-long denial and obfuscation. The Diocese should not be permitted to use its bankruptcy filing as a shield to continue the same behaviors.

## THE PARTIES

6. Plaintiff is the Official Committee of Unsecured Creditors appointed by the United States Trustee pursuant to 11 U.S.C. § 1102(a)(1).

7. Defendant is the Roman Catholic Bishop of Santa Rosa, organized under the laws of California, and the Debtor in the above-captioned chapter 11 bankruptcy case.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b), and the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), Rules 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "Bankruptcy Local Rules").

9. This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) because this is a core proceeding arising in a bankruptcy case pending in this district.

## FACTUAL BACKGROUND

*The Church's Use of Bankruptcy*

11. Some investigations have concluded that the Church has a playbook pursuant to which its geographical subparts (*i.e.*, dioceses and archdioceses) use bankruptcy to preserve their assets and minimize payments to survivors of child sex abuse.[2]

---

[2] Josh Saul, *Catholic Church Shields $2 Billion in Assets to Limit Abuse Payouts*, BLOOMBERG BUSINESSWEEK, January 8, 2020 at 4:00 a.m. CST, https://www.bloomberg.com/news/features/2020-01-08/the-catholic-church-s-strategy-to-limit-payouts-to-abuse-victims.

12. First, Catholic dioceses reportedly "precede bankruptcy by transferring and reclassifying assets. . . to shrink the pot of money available to clergy abuse victims."[3]

13. Second, typically only dioceses and archdioceses file for bankruptcy protection. As a result, only that specific, filing entity is required to disclose its assets and liabilities and participate in mediation. In the end, however, the filing entity seeks bankruptcy-equivalent relief for all of its affiliated schools and parishes in the form of third-party releases and a channeling injunction.[4]

14. Third, dioceses have used the bankruptcy process to create opacity. Specifically, whereas "[l]awsuits and trials lead to testimony and publicity," the bankruptcy process is complex and may involve confidential mediations and settlements that force "an end to existing lawsuits and block new ones."[5]

15. While the bankruptcy process serves the Debtor, in many ways it frustrates and undermines the financial and psychological interests of survivors of abuse. Past diocesan bankruptcies have (a) materially minimized the filing diocese's exposure, (b) allowed parishes and schools within the filing diocese—which invariably operate under the diocese's direct supervision and control—to escape liability entirely without making a bankruptcy-equivalent contribution for bankruptcy-equivalent relief, and most importantly, (c) deprived survivor claimants of a jury trial, and of any other opportunity to confront their abusers or to force the long-awaited public recognition of their existence and suffering by the entity that created the environment for their abuse to occur and continue. In the words of a survivor in the bankruptcy case filed by the Roman Catholic Diocese of Harrisburg in the Middle District of Pennsylvania:

---

[3] *Id.*

[4] *See, e.g.*, *In re The Archdiocese of Saint Paul and Minneapolis* (Bankr. D. Minn. Case No. 15-30125); *In re Roman Catholic Church of the Archdiocese of Santa Fe, a New Mexico Corporation Sole* (Bankr. D. N.M. Case No. 18-13027-t11); *In re Archbishop of Agaña* (Bankr. D. Guam Case No. 19-00010); *In re Roman Catholic Diocese of Harrisburg* (Bankr. M.D. Pa. Case No 20-00599 (HWV).

[5] Josh Saul, *Catholic Church Shields $2 Billion in Assets to Limit Abuse Payouts*, BLOOMBERG BUSINESSWEEK, January 8, 2020 at 4:00 a.m. CST, https://www.bloomberg.com/news/features/2020-01-08/the-catholic-church-s-strategy-to-limit-payouts-to-abuse-victims.

> I speak today because it's the only chance I will ever get on the record to tell anyone that will hear when a child is abused, his life can potentially affect countless of lives that he comes in contact with.
>
> Bishop Gainer, we are going to hold the church to those protocols so no little boy will have to live like I lived.

Attached hereto as **Exhibit A** is a true and correct copy of the Transcript of Confirmation Hearing and Joint Amended Plan of Reorganization, *In re Roman Catholic Diocese of Harrisburg* (Bankr. M.D. Pa. Case No 20-00599 (HWV)).

16. This perspective is informed by the history of diocesan cases. For instance, in one prior diocesan bankruptcy, the Chapter 11 filed by the Archdiocese of Santa Fe, it was reported that church officials demonstrated "how easy and routine it is to rejigger a balance sheet."[6]

17. The Archdiocese of Santa Fe filed for bankruptcy "in December 2018, maintaining it was too poor to defend itself [against sex abuse claims]." "The number rose to about 375 by the June 2019 deadline that the bankruptcy court had set for victims to file claims." According to court papers, the Archdiocese reported owning $49 million in real estate, cash, and investments.[7] This was despite the fact that "the church's 1951 incorporation papers put its estimated value at $40 million, or $396 million in today's dollars."[8]

18. In what may help explain the discrepancy, "church leaders said at least $178 million in cash and property associated with the archdiocese was owned by parishes or held in a trust or foundation and thus wasn't eligible for inclusion in the estate."[9]

19. According to one report, the Archdiocese of Santa Fe "began reorganizing in 2012." At that point, "business managers for the 90 or so parishes across northern New Mexico

---

[6] Josh Saul, *Catholic Church Shields $2 Billion in Assets to Limit Abuse Payouts*, BLOOMBERG BUSINESSWEEK, January 8, 2020 at 4:00 a.m. CST, https://www.bloomberg.com/news/features/2020-01-08/the-catholic-church-s-strategy-to-limit-payouts-to-abuse-victims.

[7] *Voluntary Petition for Non-Individuals Filing for Bankruptcy* at p. 19 (Bankr. D. N.M. 18-13027-t11, December 3, 2018, Dkt. No. 1).

[8] Josh Saul, *Catholic Church Shields $2 Billion in Assets to Limit Abuse Payouts*, BLOOMBERG BUSINESSWEEK, January 8, 2020 at 4:00 a.m. CST, https://www.bloomberg.com/news/features/2020-01-08/the-catholic-church-s-strategy-to-limit-payouts-to-abuse-victims.

[9] *Id.*

gathered in Albuquerque to be addressed by Tony Salgado, chief financial officer for the archdiocese." The meeting was reportedly called "to explain to the managers how to incorporate their parishes separate from the archdiocese." The legal change would reportedly allow the archdiocese to assert that "each parish was a distinct organization that owned its own property."[10]

20. This would naturally serve to shrink the pool of assets available to creditors of the Archdiocese of Santa Fe. When he was reportedly "asked how the separate incorporations would affect the parishes, Salgado stated that the move would not change day-to-day operations. 'It's just to protect us from the pedophile lawsuits.'" "Around the same time, records show, church leaders created the Archdiocese of Santa Fe Real Estate Corp. and began transferring hundreds of properties into it."[11]

21. According to the same report:

> [I]ncorporation documents for four parishes Businessweek reviewed show that the archdiocese has kept tight control. Salgado is listed as the point of contact for the parishes, and half of the board of directors for some parishes are listed as archdiocese staff. The articles of incorporation for each parish, which lay out corporate and tax information, can't be changed without the archbishop's approval.[12]

22. In addition, parishes in Santa Fe "pay 12.5% of their Sunday collection plates to the archdiocese," and "parish payments provided the vast majority of the archdiocese $6 million annual income."[13]

23. This type of activity is not limited to the Archdiocese of Santa Fe. On the contrary, it is common in the context of diocesan bankruptcy cases.

24. In the bankruptcy case filed by the Roman Catholic Diocese of Harrisburg in the Middle District of Pennsylvania, the Tort Claimants' Committee (the "Harrisburg Committee") appointed in that case successfully sought derivative standing on the basis of similar, troubling facts. In its related filings, the Harrisburg Committee stated:

---

[10] Id.

[11] Id.

[12] Id.

[13] Id.

> Prior to filing for bankruptcy, and as the rate of claims asserted by survivors of childhood sexual abuse escalated nationwide, the Roman Catholic Diocese of Harrisburg orchestrated a large-scale, fraudulent scheme to place its assets beyond the reach of its creditors—all while acting carefully to ensure that it would remain in control of such assets. The Diocese's scheme placed millions into two, self-settled trusts. The assets within these two trusts remain under the control of the Diocese and its Bishop, but the trusts wrongfully impose a thorough barrier to creditor claims against trust assets through their inclusion of broad spendthrift clauses.
>
> The Diocese now, having sought the protections of bankruptcy due to Survivors' claims, disclaims any interest in the assets held in the trusts. It asserts instead that these assets are held in trust for the benefit of, and to perform the functions of, the Roman Catholic Church within the territorial confines of the Diocese. The Diocese maintains this position despite the fact that the trust assets continue to serve as the Diocese's primary source of operational funding.[14]

25. In a similar scenario, the Official Committee of Unsecured Creditors appointed in the bankruptcy case filed by the Archdiocese of St. Paul and Minneapolis (the "St. Paul Committee") filed a motion for substantive consolidation, seeking to consolidate all parish and school assets within the scope of the Archdiocese of St. Paul's estate. In their related filings, the St. Paul Committee stated:

> In the decades preceding its bankruptcy filing, the Debtor alienated more than a billion dollars in assets as a matter of civil law by incorporating hundreds of parishes and transferring assets into newly-formed entities. The Debtor then continued to maintain exclusive control over such assets by exercising direct authority and control over the entities holding them. In fact, as a matter of their own regulations and under decrees issued by the Vatican, the Debtor was required to continue exercising control over the transferred assets and related entities. The Debtor has even attested to its ongoing supervision and control of its affiliates in certifications to the Internal Revenue Service as a means of securing tax exempt status for their affiliates.
>
> Within the next few days, the Debtor will file a plan of reorganization that (i) seeks to prohibit more than four hundred survivors of clergy sexual abuse from reaching any of the assets that the Debtor alienated as a matter of civil law, but (ii) simultaneously provides more than 200 entities holding such assets with a complete and final release of liability for sexual abuse claims. The Debtor's parishes comprise approximately 190 of the entities seeking a

---

[14] *The Official Committee of Tort Claimants' Motion for Standing and Authority to Commence, Prosecute, and Settle Causes Action on Behalf of the Debtor's Bankruptcy Estate*, ECF No. 840, at *1 (Bankr. M.D. Pa. Case No. 20-00599, December 23, 2021).

release and, to date, the parishes have flatly refused to disclose any information about their operations or holdings. Confirming a plan that extends the full benefits of bankruptcy to hundreds of entities without requiring them to disclose their assets or contribute appropriately to the payment of creditor claims would constitute nothing short of a miscarriage of justice and a grave misuse of the bankruptcy process.

Based on the limited information available to it, the Committee estimates that the Archdiocese and its parishes hold approximately $1.4 billion in assets, and that the other Consolidation Parties hold at least an additional $300 million in assets. The Committee further expects that the Archdiocese will seek to contribute approximately 1% of that amount to pay creditor claims in connection with its plan of reorganization.[15]

26. In California, on February 21, 2023, survivors filed a complaint in San Diego Superior Court accusing the Roman Catholic Diocese of San Diego of attempting a similar strategy—designed to fraudulently transfer hundreds of properties to its parishes in an effort to avoid claims of survivors alleging abuse by clergy members—on the verge of its own Chapter 11 filing.[16]

27. The lawsuit alleges that the Roman Catholic Diocese of San Diego transferred 291 properties by separately incorporating each of its 93 parishes (starting as early as 2010), and then more recently formed real estate holding companies for each parish and transferred the real property into the real estate holding companies for each parish. These transfers were allegedly unaccompanied by the payment of any money by the parishes or the holding companies. The lawsuit further alleges that the entire plan was made with the intent to hinder, delay, or defraud the survivors of clergy sex abuse.[17]

---

[15] *Memorandum in Support of the Motion of the Official Committee of Unsecured Creditors Seeking Substantive Consolidation of the Debtor's Estate with Its Parishes and Certain Other Non-Debtor Entities*, ECF No. 631, at *1-2 (Bankr. D. Minn. Case No. 15-30125, May 23, 2016).

[16] Greg Moran, *San Diego Roman Catholic Diocese ponders bankruptcy with sex-abuse lawsuits pending*, LOS ANGELES TIMES, Feb. 11, 2023 at 10:10 a.m. PT, HTTPS://WWW.LATIMES.COM/CALIFORNIA/STORY/2023-02-11/SAN-DIEGO-ROMAN-CATHOLIC-DIOCESE-BANKRUPTCY-SEX-ABUSE-LAWSUITS#:~:TEXT=THE%20ROMAN%20CATHOLIC%20DIOCESE%20OF%20SAN%20DIEGO%20IS%20WARNING%20IT,OVER%20THE%20LAST%2075%20YEARS; Greg Moran, *Roman Catholic Diocese of San Diego accused of fraudulently transferring assets to foil sex abuse liability*, LOS ANGELES TIMES, Feb. 23, 2023 at 7:42 a.m. PT, https://www.latimes.com/california/story/2023-02-23/roman-catholic-diocese-sued-assets.

[17] *Id.*

28. Finally, in a particularly analogous Chapter 11 case, the Archbishop of Agaña (the "Guam Archdiocese"), a corporation sole, in Guam, argued that, even though all Church property within the Guam Archdiocese was titled in the name of the archbishop, the vast majority of such property should not be available to pay survivor claims because the property fell outside the Archdiocese's bankruptcy estate.[18] The Guam Archdiocese based its argument on the theory that the archbishop merely held the property at issue in trust for the benefit of its parishes and schools (which entities, of course, had not filed for bankruptcy protection themselves).[19]

29. The Official Committee of Unsecured Creditors in the Guam (the "Guam Committee") filed a lawsuit seeking a ruling that the property allegedly "beneficially owned" by Guam parishes and schools was actually part of the Guam Archdiocese's bankruptcy estate.[20]

30. Following an eight-day bench trial including testimony from twenty-one witnesses, the bankruptcy court rejected the Guam Archdiocese's trust argument as a baseless legal fiction and ruled for the Guam Committee in all respects. In its written decision, the court held, among other things, that "The Archbishop holds all the properties of the religious institution that he manages and administers, as a whole and as one collective body, in his capacity as a corporation sole …"[21]

31. In support of its decision, the Guam bankruptcy court cited to multiple examples of the archbishop's control over the assets and operations of parishes and schools within his Guam Archdiocese's geographic boundaries. Upon information and belief, the Bishop of the Santa Rosa Diocese exercises the same controls over the assets and operations of the Diocese's parishes and schools, as did the archbishop in Guam.

---

[18] *Memorandum Opposing Committee's Motion for Partial Summary Judgment Under Bankruptcy Rule 7056*, ECF No. 34, at *21 (Bankr. D. Guam Adv. No. 19-00001, Official Committee of Unsecured Creditors v. Archbishop of Agaña, February 1, 2020).

[19] *Id.* at *7-21.

[20] *Complaint (Declaratory Judgment Regarding Property of the Estate)*, ECF No. 1, at *3 (Bankr. D. Guam Adv. No. 19-00001, Official Committee of Unsecured Creditors v. Archbishop of Agaña, April 6, 2019).

[21] *Memorandum of Decision, Findings of Fact and Conclusion of Law, and Order*, ECF No. 239, at *7 (Bankr. D. Guam Adv. No. 19-00001, Official Committee of Unsecured Creditors v. Archbishop of Agaña, March 17, 2022).

32. These examples are not isolated, anomalous, or exhaustive. Rather, they illustrate the Catholic Church's repeated development, execution, and refinement of its approach to the bankruptcy process over the course of nearly two dozen Chapter 11 filings.

*The Santa Rosa Diocese's Use of the "Playbook"*

33. The Diocese was created from portions of the Sacramento Diocese and the San Francisco Archdiocese in 1962, and now includes 42 parishes, some of which have associated missions. The Diocese consists of approximately 178,443 Catholics in the counties of Sonoma, Napa, Mendocino, Lake Humboldt, and Del Norte.

34. There is no indication in this case that the Diocese intends to deviate from the strategic path taken by the Catholic Church in prior bankruptcy filings.

35. Upon information and belief, in 2003, the Diocese reported assets totaling $28.8 million. These same assets would be valued substantially higher presently, at approximately $45 million, after adjusting for inflation. In 2021, however, total assets of the Diocese decreased to just under $19.4 million. Non-current receivables fell from more than $3.7 million in 2003 (which would exceed $6 million in current, inflation-adjusted dollars) to approximately $117,000 in 2021.

36. Additionally, between 2003 and 2021, total revenue for the Diocese decreased from $22.3 million (which would be valued at approximately $36 million in current dollars when adjusted for inflation) to $15.6 million in 2021.

37. Within the Diocesan operational model, the Diocese manages, controls, and oversees all higher-level business functions, while the vast majority of income is collected at the parish level through donations. The Diocese then funds itself by directing its parishes and schools to pay assessments to the Diocese.

38. Given this model, access and insight into the financials of each of the Diocese's parishes and schools will be absolutely essential to understanding the above-referenced reductions and discrepancies in the Diocese's asset data.

39. If the above trends were not disturbing enough, during the same period in which the holdings of the Diocese dropped, the holdings of certain affiliated entities grew very significantly.

40. The Catholic Charities of the Diocese was incorporated in California as a public benefit nonprofit corporation in 1979. Total assets reported by the Catholic Charities of the Diocese on its Form 990 filings increased from almost $8.5 million in 2011 (that would be over $11 million when adjusted for inflation) to almost $31 million in 2020.

41. In addition, from 2011 to 2020, total revenue for the Catholic Charities of the Diocese grew from about $6.1 million (roughly $9 million today) to nearly $23 million, again according to the organization's Form 990 filings.

42. Financial holdings of the Angela Merici and John Henry Newman Foundation grew substantially during the same period. The Angela Merici and John Henry Newman Foundation, was listed as an associated entity of the Diocese, according to its 2018 entry in the Official Catholic Directory. Incorporated in California in 2005, the registered agent for the Angela Merici and John Henry Newman Foundation was Diocesan attorney Daniel J. Galvin. Between 2011 and 2020, the total value of assets reported by the Angela Merici and John Henry Newman Foundation on its Form 990 filings grew from $1.9 million (or almost $2.6 million when adjusted for inflation for 2022) to more than $8.2 million. Notably, assets reported by the Foundation grew each year since 2017, rising from almost $2 million in 2018 to nearly $5 million in 2019, and finally $8.2 million in 2020.

43. During the seven years preceding its bankruptcy filing, in or around late 2016 and 2017, all parishes within the Diocese were reportedly incorporated separately for the first time. Despite this separate incorporation of the parishes, the Diocese continues to wield complete control over parish operations, as it has since the Diocese was created in 1962. Specifically, the Bishop oversees all the parishes, the Diocese and its Bishop retain sole authority to hire and fire pastors for each parish, and the Diocese and its Bishop must approve any parish financial expenditure over $25,000.

CORE/3528017.0002/184163946.1

44. Notwithstanding its great efforts to separately incorporate its parishes, with one exception, there were no transfers of real or personal property from the Diocese to the parishes.

45. Unlike the parishes, Catholic Cemeteries is an unincorporated association, and although the Diocese disclaims any interest in its real property, such real property is titled in the name of the Diocese.

46. In a further attempt to shelter its assets from the reach of its creditors, the Diocese entered into nearly identical Services Agreements with each of its parishes, schools, and cemeteries following the separate incorporation of the parishes in or around 2017.

47. Upon information and belief, the Services Agreements merely codified the already existing relationship between the Diocese and its parishes, schools, and cemeteries.

48. Further, the Services Agreements contain all the hallmarks of sham contracts: namely, the Diocese and its parishes, schools, and cemeteries did not negotiate the terms of the Services Agreements, the Services Agreements are for a term of infinite duration, the parishes, schools, and cemeteries lack any termination rights under the Services Agreements, and no consideration supports the Services Agreements.

49. Recalling the decision of the Guam bankruptcy court, which interpreted a virtually-identical religious incorporation statute to that of California, when a Bishop controls parishes and schools and holds legal title to all of their property, the Diocese and those parishes and schools are one and the same thing as a matter of civil law. Parish assets are thus not distinct from those of the Diocese and cannot be segregated from Diocese holdings or sheltered from Diocesan creditors.

50. If the assets of the Diocese and its parishes and schools were one and the same in 2016, as the Guam decision states, then the Diocese's separate incorporation of its parishes and schools in the period since 2017 was a monumental divestment of assets. What is worse, this divestment occurred at a time when the Diocese was aware of its significant liability for claims of child sexual abuse, and at this time, there is no evidence that the Diocese received any meaningful value in exchange for its quiet divestment of all parish and school assets.

Case: 23-01008    Doc# 1    Filed: 09/01/23    Entered: 09/01/23 15:26:42    Page 12 of 15
12
CORE/3528017.0002/184163946.1

51. According to a recent review of assessment records with county assessor's offices within the Diocese, the aggregate, assessed value of properties associated with parishes within the Diocese totals over $48 million and, in addition, the aggregate, assessed value of properties associated with private and parochial schools within the Diocese totals over $31 million.

52. Upon information and belief, the Diocese itself directed and oversaw the alienation of its own substantial assets into the separate corporate forms of its parishes and schools in the years immediately preceding its bankruptcy filing. In September 2016, weeks before Gov. Jerry Brown signed SB 813, the Justice for Victims Act, to remove California's 10-year limit on prosecuting sex-related crimes, the Diocese's Finance Council noted, according to minutes from a meeting, that the Diocese was "changing the civil corporate structure of each parish into a separate Corporation Sole."

53. Further, a long-time attorney for the Diocese, Daniel J. Galvin, reportedly oversaw the effort to separately incorporate all parishes and schools within the Diocese. As of July 2022, Mr. Galvin was the registered agent for 44 parishes, missions, and convents, each of which were incorporated in California between 2016 and 2018 and listed in the Diocese's Official Catholic Directory. Mr. Galvin was also the registered agent for the Catholic Charities of the Diocese.

***After Incorporating its Parishes, the Diocese Files Bankruptcy***

54. On March 13, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

55. The Debtor's voluntary petition filing created an estate, as defined by 11 U.S.C. § 541(a), including all of the Debtor's legal or equitable interests in property as of the commencement of the case, and any interest in property that the estate acquires after the commencement of the case.

56. On April 6, 2023, pursuant to 11 U.S.C. § 521 and Bankruptcy Rule 1007(b), the Debtor also filed its Statement of Financial Affairs ("Statement") and its Schedules of Assets and Liabilities ("Schedules"), with amendments thereto on May 17, 2023.

57. In Part 11, Question 21 of the Statement, the Debtor lists property owned by the Debtor but allegedly "held for the benefit of the parishes and other entities of the Diocese…." In

total, the Debtor claims to hold 136 parcels of real property in trust for various Diocese affiliates, including Catholic parishes, schools, and cemeteries. Attached as **Exhibit B**, and incorporated herein, is a true and correct copy of the Statement. All the property listed in Part 11, Question 21 shall be referred to together as "Disputed Property."

58. The Diocese has admitted under oath that no written trust agreements exist for any of the Disputed property.

59. Similarly, the Diocese has not submitted any annual reports to the State of California with respect to the property it purportedly holds in trust for the benefit of another.

60. The Committee alleges that the Disputed Property belongs to the Diocese and should be scheduled as property of the estate.

61. The Committee further alleges that the Disputed Property is in fact under the Diocese's complete control and domination, and that the Debtor owns the Disputed Real Property.

62. As in other Diocesan bankruptcies, the Diocese has not scheduled the Disputed Property as assets of the estate. Therefore, an actual controversy exists concerning whether the Disputed Property are assets of the estate.

## CAUSE OF ACTION
### (Declaratory Relief)

63. The Committee repeats and realleges each of the allegations contained in paragraphs 1 through 62.

64. In its Statement and Schedules, the Diocese did not include the Disputed Real Property and Disputed Personal Property as property of the estate.

65. The Committee contends that the Disputed Property is, in fact, property of the Diocese's bankruptcy estate free and clear of the interests of any other person or entity.

66. An actual controversy exists with respect to the interests of the estate in the Disputed Property.

67. Therefore, the Committee respectfully seeks an order of this Court declaring that the Disputed Property is property of the estate.

**WHEREFORE**, the Committee seeks relief as hereafter set forth.

# PRAYER FOR RELIEF

(a) A declaratory judgment that the Disputed Property is property of the estate free of the interests of any other person or entity; and

(b) Such other and further relief as is just and equitable.

Dated: September 1, 2023

STINSON LLP
KELLER BENVENUTTI KIM LLP

*/s/ Robert T. Kugler*
Robert T. Kugler

*Counsel for the Official Committee of Unsecured Creditors*