**Exhibit A**

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF PENNSYLVANIA
## HARRISBURG DIVISION

```
IN RE:                          )  Case No. 1:20-bk-00599-HWV
                                )  Chapter 11
                                )
ROMAN CATHOLIC DIOCESE OF       )
HARRISBURG aka DIOCESE          )  Bankruptcy Courtroom No. 1
OF HARRISBURG,                  )  Ronald Reagan Federal Building
                                )  228 Walnut Street
                                )  Harrisburg, Pennsylvania 17101
        Debtor.                 )
                                )  February 15, 2023
                                )  11:00 a.m.
```

TRANSCRIPT OF CONFIRMATION HEARING AND JOINT AMENDED PLAN OF
REORGANIZATION (1470)
BEFORE HONORABLE HENRY W. VAN ECK
UNITED STATES CHIEF BANKRUPTCY JUDGE

APPEARANCES:

```
For the Debtor:                 Waller Lansden Dortch & Davis LLP
                                By:  BLAKE D. ROTH, ESQ.
                                     SCOTT KUNDE, ESQ.
                                     KRISHNA PATEL, ESQ.
                                     KENDRIA LEWIS, ESQ.
                                511 Union Street
                                Suite 2700
                                Nashville, Tennessee 37206


For the Official               Stinson LLP
Committee of Tort              By:  ROBERT KUGLER, ESQ.
Claimants:                          EDWIN CALDIE, ESQ.
                                50 S. 6th Street
                                Suite 2600
                                Minneapolis, Minnesota 55402


AUDIO OPERATOR:                 KAREN DAVIS


TRANSCRIPTION SERVICE:          TRANSCRIPTS PLUS, INC.
                                435 Riverview Circle
                                New Hope, Pennsylvania 18938
                                Telephone:  215-862-1115
                                e-mail CourtTranscripts@aol.com
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

APPEARANCES:
(continued)

For U.S. Trustee:              U.S. Trustee's Office
                              By:  GREGORY B. SCHILLER, ESQ.
                                   TROY SELLERS, ESQ.
                              228 Walnut Street, Suite 1190
                              Harrisburg, Pennsylvania 17101


     (Other nonparticipating individuals attending via Zoom in
      "listen only" mode and did not give an oral appearance)

                         * * *

## INDEX

**PAGE**

Proffer of Christopher Linscott by Mr. Roth          6

Findings of Facts and Conclusions of
Law by the Court                                     12

Statement by Patrick Duggan                          18

Statement by Bishop Gainer                           27

1    THE COURT:  Good morning, everyone; please take your

2  seats.

3    MULTIPLE SPEAKERS:  Good morning, Your Honor.

4    THE COURT:  Today is February 15th, it is 11 o'clock.

5  This is the time specially set for the confirmation hearing

6  involving the Roman Catholic Diocese of Harrisburg.

7    It's good to see all of you in the courtroom today.

8  I haven't seen this many people here in quite some time, so

9  you're all welcome.

10    I want to welcome all of you who are appearing by

11  Zoom as well.  Just a reminder, you are appearing in Federal

12  Court, so we ask that you observe normal courtesies and turn

13  your camera off and your microphone off unless you're

14  participating in the hearing.  Also, if you are participating

15  and you have your camera on, please make sure to turn it off if

16  you're going to engage in activity that's unrelated to the

17  hearing as it could be distracting to those of us who are here

18  in the courtroom.

19    So again, welcome.  We'll begin with entry of

20  appearances for the Debtor.

21    MR. ROTH:  Good morning, Your Honor.  Blake Roth,

22  Waller Lansden, on behalf of the Debtor.

23    I also have with me today Scott Kunde, Krishna Patel,

24  and Kendria Lewis also on behalf of the Debtor.

25    THE COURT:  Welcome.  And for the Official Committee?

1        MR. KUGLER:  Good morning, Your Honor.  Robert Kugler

2   and Ed Caldie on behalf of the Committee.

3        And I'd like to say it's a pleasure to be back in

4   here.  It was literally three years ago, I believe, that was my

5   last visit live here with you, and I wish it hadn't been so

6   long, but I'm glad to be back here.

7        We have a number of survivors in the courtroom today

8   as well, including two members of the Committee, and the third

9   member of the Committee is on Zoom.  So that is everybody

10  that's here on behalf of the Committee.

11       THE COURT:  I appreciate that, thank you very much

12  for the information.  And, yes, it's been quite a while, though

13  we've seen each other between then and now, many times by Zoom.

14  Technology allows us to do things that we couldn't do just a

15  few years ago.

16       So I do recognize some of the parties in the

17  courtroom, and I welcome you all.

18       I suppose there's no agenda, Mr. Roth, because we

19  really only have one item --

20       MR. ROTH:  That's correct, Your Honor.

21       THE COURT:  -- to deal with, and so do you have a

22  preference on how you'd like to -- it's a joint, so I should

23  suggest -- it's between the two of you, but I do look to you

24  first, Mr. Roth, as counsel for the Debtor.

25       MR. ROTH:  Well, thank you, Your Honor.

1          THE COURT:  If you could pull that microphone closer

2    to you, I want to make sure we get a good record here.

3          MR. ROTH:  Thank you, Your Honor.

4          The Debtor's preference would be to proffer the

5    testimony of Christopher Linscott through the declaration that

6    we filed on Friday with the Court, make him available for

7    cross-examination, and then we have a brief presentation on the

8    plan itself and it being confirmable.

9          And then following that, I believe the Committee has

10   a survivor or two that would like to address the Court.

11         And following that, Bishop Gainer would also like to

12   address the Court.

13         And then we would ask the Court, based on what has

14   been presented, to confirm the plan.  So that was how we had

15   envisioned the day, subject to any changes or anything I got

16   wrong based on our conversations with the Committee.

17         THE COURT:  That does sound -- is that agreeable to

18   you?

19         MR. KUGLER:  Yes, it is, Your Honor.

20         THE COURT:  Well, then terrific, let's go ahead and

21   proceed, if you want to begin with the proffer.

22         MR. ROTH:  So, Your Honor, we filed on February 10th

23   at Docket Number 1520, the declaration of Christopher Linscott.

24   We filed it both in support of the settlement agreement, which

25   Your Honor has already approved, and then also in support of

1  confirmation.

2        Mr. Linscott's declaration goes through the factual

3  confirmation elements, in addition to the feasibility of the

4  Debtor and the liquidation analysis.

5        Mr. Linscott is in the courtroom today, so we can

6  subject him to cross-examination to anyone who would like to,

7  but we would like to, in the interest of efficiency and the

8  Court's time, proffer his declaration as his direct testimony.

9        THE COURT:  Very good.  I have reviewed the

10 declaration, and I note for the record, there were no

11 objections to the plan.  I'm not aware that anyone would like

12 to subject him to cross-examination.  Does the Committee have a

13 position on that?

14       MR. KUGLER:  Your Honor, we have no cross-examination

15 for Mr. Linscott, and we think that he has addressed the

16 elements under 1129(a) that are appropriate to be addressed,

17 and so we're -- we do not intend to engage in cross-

18 examination.

19       THE COURT:  And are you aware of any parties, any of

20 your constituency who have voiced an interest in doing so?

21       MR. KUGLER:  No, I'm not, Your Honor.

22       THE COURT:  Is there anyone in the courtroom who is

23 interested in asking questions of the witness that's been

24 proffered by the Debtor in support of their request for

25 confirmation?

1      (No audible response heard)

2           THE COURT:  I'm remiss; I recognize the Assistant

3  United States Trustee, Mr. Sellars.  Good morning, sir.

4           MR. SELLARS:  Good morning, Your Honor.  Troy

5  Sellars and Gregory Schiller for the United States Trustee's

6  Office.

7           THE COURT:  Very --

8           MR. SELLARS:  Am I being --

9           THE COURT:  He wasn't near a microphone, but he did

10  introduce himself as Mr. Sellars and his trial attorney, Mr.

11  Schiller, both of whom I recognize.

12           MR. SELLARS:  Thank you, Your Honor.  And we have no

13  interest in cross-examination.

14           THE COURT:  Okay.  And for the record, you are

15  familiar, Mr. Sellars, with the affidavit and with the plan,

16  and you've been advised throughout the process?

17           MR. SELLARS:  Yes, Your Honor.

18           THE COURT:  Okay, thank you.

19           MR. SELLARS:  And, Your Honor, Mr. Schiller, I think,

20  at the end will have a small statement from the United States

21  Trustee's Office.

22           THE COURT:  Thank you.

23           I'm not aware of anyone else that has either filed an

24  official or unofficial objection with the Court to the

25  confirmation.

1          Normally, this process is a bit more involved.  This

2 is a difficult time.  I think it needs to be recognized, the

3 efforts of the professionals in this case, including the

4 mediator that was appointed.  It was a very difficult case,

5 very difficult circumstances, as we're all well aware.  And

6 when the case began, there was certainly no guarantee that we

7 would end up in the position that we are here now.

8          But the Court notes that a joint plan was submitted

9 by the Debtor in possession, the Debtor in this case, the Roman

10 Catholic Diocese of Harrisburg, and by the Committee.  That

11 doesn't happen in every case.  So I do recognize the efforts

12 that have been made, and the time that it took to get here, and

13 I would be remiss if I didn't make note of that.

14          Mr. Roth, there were no priority tax claims in the

15 plan.

16          MR. ROTH:  That is correct, Your Honor.

17          THE COURT:  Okay.  And, forgive me, I don't recall,

18 the administrative expenses, are they to be paid on the

19 effective date?

20          MR. ROTH:  With the exception of professional fees,

21 that is correct.  Professional fees remain subject to the final

22 fee applications to be approved by the Court.

23          THE COURT:  Okay, thank you.  I don't have any need

24 or desire to subject Mr. Linscott to any questions from the

25 Court.

1          To be clear, there were -- nobody came forward from

2    within the courtroom when I asked if there was an interest in

3    asking Mr. Linscott questions.  He has made himself available

4    to cross-examination.  And now would be the time if anyone had

5    concerns or reservations that they needed addressed to advise

6    the Court of same, offer a proffer as to why cross-examination

7    is necessary.  And if appropriate, that opportunity will be

8    afforded.

9          And for purposes of absolute clarity, I'll extend

10    that invitation to anyone on Zoom, though I wouldn't normally

11    do so, but under these circumstances, I don't want anyone who

12    has navigated their way through the technology necessary to

13    appear here to feel as though they weren't afforded that

14    opportunity.

15          So is there anyone appearing by Zoom who would like

16    to ask a question of Mr. Linscott before we proceed?

17                    (No audible response heard)

18          THE COURT:  So the record reflects, there was no

19    response.  I didn't anticipate there would be, I just want to

20    be very clear on the record.

21          I suppose at this time it would be appropriate for me

22    to indicate that I have reviewed all of the pleadings, the

23    plan, the attachments to the disclosure statement, the various

24    documents that were filed with the Court in connection with the

25    request that's being made today, and specifically that request

1   is a request to confirm the joint amended plan of

2   reorganization that was submitted by the plan proponents here.

3   And the plan proponents here are the Roman Catholic Diocese of

4   Harrisburg and the Official Committee of Tort Claimants.  I'll

5   refer to them now as the "Committee" and the "Debtor" for sake

6   of ease.

7          They are requesting confirmation of their plan under

8   the consensual provisions of 1129(a).  Is that correct, Mr.

9   Roth?

10          MR. ROTH:  That is correct, Your Honor.

11          THE COURT:  Okay.  Mr. Kugler?

12          MR. KUGLER:  That is correct, Your Honor.

13          THE COURT:  Okay.  And we have had notice that went

14   out to all of the interested parties, and to the creditor body

15   at large.  And following that notice, and an opportunity for a

16   hearing today, and based on the presentation by the parties,

17   which includes the affidavit of Christopher Linscott, and in

18   the absence of any objections, I am prepared to make certain

19   findings, as nobody's come forward to interpose an objection at

20   this time.

21          Mr. Roth, would you prefer those findings to be made

22   now, or after we hear from anyone who might be interested in

23   submitting statements to the Court?

24          MR. ROTH:  I'll defer to the Committee on the order

25   because, in all candor, it's the Committee's constituency that

1   has asked to make statements.

2          MR. KUGLER:  Thank you, Your Honor, for the

3   consideration.  I think it's appropriate to make the findings

4   and to kind of wrap-up the legal business.  And then the

5   comments will be more in the nature of a discussion, a little

6   bit of a discussion between the survivors and the Diocese.

7          THE COURT:  Very well.  I just wanted to be clear so

8   there was no disappointed expectations.  Thank you for that.

9          So the Court does make the following findings.  This

10  is the only proposed plan in this case.  The Court notes that

11  this is a jointly proposed plan with no objections.  There were

12  two prior plans that were filed but both were abandoned in

13  favor of this joint plan.

14         The proponents of this plan are entitled to propose

15  it.  And the plan has conformed to the disclosure and

16  solicitation requirements of Title 11, U.S.C. 1125.

17         The plan has been proposed in good faith and not by

18  any means forbidden by law.  The principal purpose of the plan

19  is not for the avoidance of taxes, and nor is it for the

20  avoidance of Section 5 of the Securities Act of 1933.  Indeed,

21  it seems that the paramount goal of this bankruptcy plan, as

22  more fully detailed in the plan and the disclosure statement,

23  and in the affidavit submitted by Mr. Linscott, is to provide

24  compensation for unresolved survivor claims, while also

25  preserving the ability of the Debtor to continue its ministries

1  and services within the Diocese.

2  The proponents have disclosed all payments to the

3  Court that have already been made or propose to be made under

4  the plan.  And any payments that have to be made are reasonable

5  in the Court's judgment.

6  All administrative expenses will be paid in full,

7  with the exception of certain fees subject to Court approval as

8  of the effective date of the plan.  There are no involuntary

9  GAAP expenses in this case.

10  And to the extent that it's applicable, and it may

11  not be here, I do find that to the extent there are any wages,

12  or benefit plans, or consumer deposits, which I don't think

13  there are, those will be paid in accordance with the

14  requirements of Title 11.

15  Also, to the extent applicable, though I don't

16  believe there are any, all tax claims that the Court is aware

17  of have been paid or will be paid in accordance with the Code.

18  The plan does not violate those provisions.

19  All classes of claims and interests, claims

20  primarily, have been properly designated pursuant to Section

21  1122 of Title 11, and at least one class, not including

22  insiders, has accepted the plan.  Indeed, all of the classes

23  have accepted the plan, according to the summary of ballots on

24  the docket and the affidavit from Epiq.

25  The plan is in the best interest of the creditors for

1   purposes of the Bankruptcy Code and for purposes of

2   confirmation.

3          To the extent there was any dissenting holders of a

4   claim, the Court determines that he or she will receive or

5   retain property that is of a value as of the effective date of

6   the plan that is not less than the amount that that holder

7   would receive if the case were liquidated under Chapter 7.

8          The Court has reviewed Exhibit B to the disclosure

9   statement, which was a liquidation analysis, and also I have

10  reviewed the affidavit, I'll call it the "Linscott Affidavit,"

11  which contained information supporting that.

12         I find that there is adequate means for execution of

13  the plan, that's been provided.  This confirmation is not

14  likely to be followed by a liquidation or a further need for

15  reorganization with regard to these debts.  This conclusion is

16  based on the cash flow projections that were attached to the

17  disclosure statement as Exhibit C and, again, the Linscott

18  Affidavit.

19         I do find that the channeling injunction is a

20  critical component of the plan and that it satisfies the

21  conditions of 524.

22         Do the plan proponents have any other concerns with

23  regard to findings of fact or conclusions of law they would

24  ask the Court to recognize or entertain as needed for

25  confirmation?

1          MR. ROTH:  Just two, Your -- just one, Your Honor.

2    We also believe the plan complies with 1129(a)(16) which

3    applies to a nonprofit corporation.  We aren't aware of any

4    laws that prohibit a nonprofit corporation from paying its

5    liabilities, and so we don't believe there's any applicable

6    law.  So we do believe the plan complies with that provision of

7    1129(a)(16).

8          And then the Court did recognize that the channeling

9    injunction can be confirmed, but we wanted it to be clear that

10   the supplemental settling ensure injunction, as well, complies.

11   In review of Third Circuit case law, we believe that courts

12   generally look at the releases and the injunctions, including

13   exculpations so far as it's limited to post petition

14   liabilities, follow the same standard.  But we wanted to be

15   clear that all of those were being approved today, or at least

16   included within the Court's findings.

17         THE COURT:  Yes.  Say belts and suspenders and

18   suspenders approach, I understand.

19         MR. ROTH:  Yes.

20         THE COURT:  It was hard for adversary proceedings and

21   settlement agreements, which I've have already approved and

22   reviewed at length.  It was clear that this was a component

23   that was essential to achieve funding for the plan.  It was

24   noticed properly, there were no objections, and I do agree that

25   the plan satisfies 1129(a)(16); I have no information

1  indicating that it would not.  There has been no indication
2  that it would not.  I accept the proffer and the Linscott
3  Affidavit, to the extended addresses that.  It does with regard
4  to public policy, at least, and so I do make that finding.
5          I will also acknowledge supplemental injunction as
6  meeting the legal requirements necessary for enforceability.
7  And upon confirmation of the plan, it will be enforceable.
8          Mr. Kugler, anything that you can think of?
9          MR. KUGLER:  No, I think you have covered everything.
10 With the able assistance of Mr. Roth, I think we've covered
11 everything.
12         THE COURT:  Yes, and I appreciate that.
13         Mr. Caldwell, you're uncharacteristically quiet.
14         MR. CALDIE:  Caldie.
15         THE COURT:  Oh, Caldie; sorry.
16         MR. CALDIE:  Yes, yes.  And I agree with my partner.
17 This is one of those rare occasions, Your Honor.
18         THE COURT:  Okay.  It's good to hear.
19         So those are the legal formalities, as I think Mr.
20 Kugler, indicated important.  But I'm not going to issue a
21 ruling until I've heard from anybody who would like to make a
22 statement for the Court's consideration before it issues its
23 order.
24         Is there anybody who, at this time, would like to
25 come forward and be heard?

1          MR. KUGLER:  So, Your Honor, maybe I could introduce

2     the Committee member, Patrick Duggan.

3          MR. SCHILLER:  Can we go first?

4          MR. KUGLER:  Do you guys want to speak first?

5          MR. SCHILLER:  Yeah, we'll -- that way we'll get out

6     of the way.

7          MR. KUGLER:  Okay, sure.  The U.S. Trustee, I think,

8     wants to speak first.

9          THE COURT:  The U.S. Trustee, sure.  Come on up.  Mr.

10    Schiller, you can come to the podium.

11         MR. SCHILLER:  Certainly.  Your Honor, good morning.

12    Gregory Schiller for the U.S. Trustee.

13         For the record, I have reviewed the final version of

14    the plan, Mr. Linscott's declaration, and all of the related

15    documents.

16         The U.S. Trustee does support confirmation of the

17    plan.  And we'd like to thank the Debtor, the Committee, and

18    especially their professionals, for all of their hard work and

19    the courtesies that have been extended to us throughout the

20    process.

21         THE COURT:  Very good; thank you.  I appreciate

22    always the UST's input in all cases, and particularly Chapter

23    11 cases.

24         MR. SCHILLER:  Thank you, Your Honor.

25         THE COURT:  So, thank you for your input and hard

1  work.

2          MR. SCHILLER:  Thank you.

3          MR. KUGLER:  Okay, now, Your Honor, Mr. Duggan would

4  like to address the Court and the Bishop a little bit with

5  respect to the survivor perspective on all this.  So, Pat --

6          THE COURT:  Come on forward, Mr. Duggan.

7          MR. KUGLER:  And you can take a chair up there or --

8  it would be easier if you were facing the Bishop.

9          THE COURT:  Whichever you're more --

10          MR. DUGGAN:  Can I move this, kind of, because

11  there's a wire.

12          THE COURT:  Whichever you're more comfortable with,

13  sir, you can have a seat here if you like.

14          MR. DUGGAN:  There's a table here, perfect.  Thank

15  you, Your Honor.

16          Can everybody hear me okay?

17          MR. KUGLER:  Yeah.

18          MR. DUGGAN:  When I got here looking around the room,

19  and you listened to me today -- the majority, by the way, I

20  hope you listened as clergy, as a father, a brother, or an

21  uncle, and put it in that perspective for yourself.

22          The first thing I'd like to do is thank the Committee

23  members.  Lara Fortney, she's a warrior.  Also, Mark Padula, he

24  was our scribe.  Mark, we had lots of ideas.  I had lots of

25  ideas, but Mark put it in a written format for the protocols,

1 that was extremely, extremely helpful.

2          I'd like to thank the law office of Stinson Law,

3 Robert Kugler, Ed Caldie, the Logan Kugler -- Kugler, I'm

4 sorry, and the entire staff at the law firm.

5          And finally, Richard.  And this is a personal one of

6 mine, Richard and Mary Ann, Richard Serbin, he's been an

7 attorney, but a friend.  His written me letters, called me.  He

8 called me at 9:30 last night, and told me to make sure I slept.

9          Finally, I want to thank Bishop Gainer.  I truly want

10 to thank Bishop Gainer.  I believe that by accepting the child

11 protocols, that he's serious, very serious, about preventing

12 this from happening in the future.  And I want you to know, I

13 truly appreciate that, and I thank you.

14          To the victims of child sexual abuse, you can be

15 totally convinced that the Committee and counsel, without the

16 presence of a window legislation, were able to come to the best

17 possible settlement that provides some sort of comfort to the

18 victims in the Diocese of Harrisburg.

19          As I thought and prayed for guidance, a word kept

20 coming to my mind, and that word is "dichotomy."  I grabbed the

21 Webster Dictionary, and it's defined in this way, "A division

22 or contrast between two things that are representing as being

23 opposed or entirely different."  And it's in this context that

24 it comes to me.  Growing up in a Catholic family with nine

25 siblings, I learned of love, love of God, holy sacraments,

1  devotion to family from the church.  However, it is the church

2  that failed to protect the most vulnerable members of their

3  congregation's from abuse.

4           The process is bittersweet because you never get a

5  chance to sit down and talk to the people who were responsible,

6  so it's a bittersweet process.  And as I thought about this,

7  there's two questions that most survivors have.  The first

8  question is, "Why did they choose me?  What was it about me?"

9  And the second question is, "Why did they choose to cover it

10 up?"  And those you don't really get fully answered, there's

11 some things in the protocol which will alleviate that to some

12 sort.

13          As a young boy, more than anything, I wanted to be a

14 Catholic priest.  I loved my Church.  And even as a young

15 child, I recognized how we were different from other kids in

16 the neighborhood.  We lived in a poor neighborhood, and there

17 was only a couple of us that went to Catholic school.  In the

18 seventh grade, I met Mr. Ronald Stewart, a history teacher, at

19 St. Francis School.  His house was next to the school, the

20 fence of his house was the playground fence that leaned up

21 against his house.

22          Some of my friends and I started going to that house

23 almost every day after school.  The porch was visible from the

24 priest's residence, the back window.  And for many years, even

25 after, we went there several times a week to that house, lots

1  of us, and lots of other boys.

2          As a young boy of 13, I was smoking marijuana almost
3  every day.  In that home happened to be the first place I ever
4  smoked marijuana.  In that home was the first place I took a
5  drink of alcohol.  In that home was the first place I started
6  taking amphetamines and became addicted highly to them for a
7  big portion of my life.  In that home was the first place I
8  ever did acid, which later I learned has caused several
9  emotional difficulties.

10          Gentlemen, what if it was your boy?  It was the first
11  place I was repeatedly sexually raped and abused for several
12  years.  Why do I even say the next part?  One night after
13  basketball practice, I want there.  And I was viciously and
14  violently raped by a group of men, bent over the table in the
15  middle of the room and laughed at.  I was completely and
16  totally shattered that day.  I was broken.  I went home, went
17  down our dirty basement, got in the shower, and washed
18  everything away.  Curled up in a ball in the corner of that
19  dirty, filthy place and became what I became.

20          At the age of 13 -- or at the age of 17, I was found
21  at 13th and Derry in the street, and I had overdosed, sent to
22  Harrisburg Hospital, went to the psych ward.  You see, you had
23  to cover all these things up, you couldn't talk to them.  My
24  parents didn't talk to anybody.  We didn't talk to anybody.
25  You had to cover these things up.

Case: 23-01008   Doc# 1-2   Filed: 09/01/23   Entered: 09/01/23 15:26:42   Page 22 of
32

1        February 16, 1979, I was arrested because I had a

2    stolen firearm on me.  And for 13 to 17, I was a thief, a

3    burglar, a drug addict, whatever I could, mainly to get

4    amphetamines, whatever I could do.  This could be your son.

5    This could be your family.

6        They were able to get me, through my father's

7    political connections, into the Air Force; there's a dichotomy.

8    Because I went to Catholic school, I had a good education, even

9    though I didn't go very often, I was pretty smart.  And I was

10   able to go in the Air Force and I had a good four years, no

11   drugs, struggled with drinking, with no drugs, and I excelled.

12   What I found out in life is I was always able to make money and

13   excel, and it's always because I had to prove to myself that I

14   was a man.  There was nothing wrong with me, so I had to prove

15   that all the time.  And that's what a lot of child sexually

16   abused people do is they constantly try to prove that they're

17   okay, that there's nothing wrong with them, that they didn't do

18   anything.

19       I met my wife at church.  I had started going to a

20   Protestant church, and I met my wife.  She was beautiful, kind,

21   loving.  Actually, I looked over to her and I saw her there,

22   and I elbowed my buddy and I said, "I'm going to marry her."

23   And I did.  Things were going good.  I helped a guy start a

24   company.  We were making money.  I bought a house.  It was

25   right after I got out of the Air Force.  And for no reason that

1  I know of, I started in amphetamines, one time.  Then cocaine.

2  And she left, as she should have.  They moved to Washington

3  State; we were living in Texas.  I left all my furnishings and

4  my house, I drove out to Washington so I could at least grow up

5  close to my daughter's Rachel.

6          I say these things, and I address parents because so

7  often we remember the victims, as we should, but we forget the

8  tentacles.  I pace constantly.  My daughter paces constantly.

9  Sweetest, kindest human being on the planet, wonderful mother,

10 nurse, but as I had my struggles, she had her struggles.

11         I moved into a tiny one-bedroom apartment in Mount

12 Vernon, Washington, it was really a drunk house.  About 300

13 bucks a month then, and I started over.  Didn't touch drugs or

14 alcohol for 10 years, went to hundreds of AA and NA meetings

15 all the time, but I never addressed the root problem.  See, I

16 had to park that.  That's what's ironic about the window

17 legislation.  When people say you're not ready, I had to park

18 it, I could not dwell on it.  I couldn't, I had to put it in a

19 different place.

20         Worked hard, bought rental property.  And it was the

21 worst 10 years of my life.  That made sense.  I white-knuckled

22 every day.  I beg God to take my life, hundreds times; there's

23 the dichotomy.  I couldn't do that.  Because of my beliefs in

24 the church, I couldn't do that.  So I was stuck in this world

25 that I couldn't leave, but I hated being there, stuck like

1  that.

2       I joined the Army Reserve.  And I always had to prove

3  that I was a tough guy, the man.  I went to drill sergeant

4  school.  I went -- ended up teaching the psychological

5  coordinated.  Graduated drill sergeant school first in my

6  class, highest physical fitness score at that time they ever

7  had because I had to do it in anger and rage.  I had to beat

8  everybody.  I had to be number one.  Never really recognizing

9  it that much.  I had an injury, which caused me -- I could no

10 longer be there.  I had an injury in a track vehicle where I

11 struck my head, and I could no longer be in the military.  And

12 that's where I got all my value and worth because I could feel

13 like I wasn't -- I was a man.

14      That's also where I met my wife, Christine.  She was

15 a drug addict and a drunk.  How could you love somebody like

16 that?  Christine was horribly sexually abused and a Catholic,

17 and she was the first person who could see me.  She was the

18 first person who could understand me.

19      We had a son, his name was Patrick.  Chris couldn't

20 recover; she left.  I was having so many problems, I moved back

21 here to Pennsylvania.  You know, I have a big family.  And my

22 son was always really angry, very, very angry about that.  And

23 I got a call one day that she had flipped her car seven times,

24 and over -- she was three times the legal limit, and she had

25 already wrecked several of my cars, and drugs.  Chris is

permanently paralyzed.  The tentacles, the effect.  It's just not the children.

My son grew up so angry.  Always mad, and always me trying to help him.  He became a drug addict.  On April 22nd, 1999, I walked in his room, and he laid dead.  I pulled him to the floor, and I tried to start his heart, but I couldn't.  This is what child abuse is about.  It's not about windows or everything else.  This is what it's about.

One of the little less conversations I had with my 92-year-old mother was the fact that she said she tried, I don't want to name the priest, but she wanted to talk to him because she heard rumors, she said she tried.  But she was always so guilty that Patrick, my son, was the last child with the name of my family.  That big family, he was the one who had the chance to bring our name forward, our last name.  This is the effect of child abuse.

I do realize that many of my problems, I have a responsibility, and I understand that.  I really do understand that.  I often call my mom the fifth victim.  My wife Natalie, the first victim.  Christine, the third.  My son the fourth.  And then all my nieces and nephews, especially my sister, Rosemary, who loved him so much.  All of them, they -- I went to his grave yesterday, and I told him, Patty, like I told him a million times, I'm sorry, it's not you a fault, that I was who I was, and you saw my struggles and his mom's.

1          I'm sorry.  I speak today because it's the only
2 chance I will ever get on the record to tell anyone that will
3 hear when a child is abused, his life can potentially affect
4 countless of lives that he comes in contact with.
5          Bishop Gainer, we are going to hold the church to
6 those protocols so no little boy will have to live like I
7 lived.
8          I was walking uptown Harrisburg, and I -- Our Lady of
9 the Blessed Sacrament Church, there's stairs there, it was soon
10 after I was viciously abused, and I walked up the stairs and I
11 grabbed the door to go in, and it was locked.  I said to
12 myself, you're so filthy, you're so violent, and dirty, and
13 disgusting, you're garbage.  So much so that God hates you, and
14 that I took decades to prove it was right.
15          Those protocols, hopefully, will allow no girl or boy
16 to have to feel that way again.
17          Thanks for the opportunity.
18          THE COURT:  Thank you, sir.
19          MR. KUGLER:  Your Honor, I don't believe there's any
20 other survivors who intend on speaking today, so I think it's
21 over to the Diocese.
22          THE COURT:  If the Bishop would like to come forward,
23 you're --
24          MR. ROTH:  Yeah.
25          THE COURT:   The stand is open to you, as well, sir.

1          MR. ROTH:  You can go here, you can go there.

2          THE COURT:  Wherever you're most comfortable.

3          MR. ROTH:  Yeah, whichever you prefer.

4          BISHOP GAINER:  Thank you, Your Honor, for the

5     opportunity to address the Court.

6          Pat, I want to address you first, and all those you

7     represent, I thank you for your courage this morning to share

8     your story as beautifully and thoroughly as you did.  I thank

9     you, too, for the confidence that you expressed, that I and the

10    Roman Catholic Diocese of Harrisburg is serious -- are serious,

11    about observing, implementing, and following most carefully the

12    protocols as they exist and as you and the Committee have

13    suggested to be changed.  I thank you for that confidence.

14         As I listened to you, Pat, telling your story, it is

15    tragic to know that the church, your church, failed you and

16    caused the unthinkable pain that you so rightly described

17    today.  There are no words that I can offer that will ever take

18    that pain away.  Children are our most precious gift and we,

19    the church, failed to protect you when you were most in need of

20    that protection.  We failed in our responsibilities, and for

21    that, I am deeply sorry.

22         The sin of clergy abuse deeply hurts so many as you

23    described in those tentacles that go out from the life of the

24    one who was abused.  Certainly each of you, the survivors who

25    are here in the courtroom, who are present by way of Zoom, and

1  who are part of the Tort Committee, but also your families and,
2  indeed, our whole church community.
3          As the Bishop of the Diocese of Harrisburg, today I
4  commit and pledge that our Diocese will never cease in our
5  determination to offer loving, compassionate care for survivors
6  of abuse, and to continue to do all that we can to prevent
7  future abuse.
8          To Pat, and to the survivors that you represent, I
9  thank you again for telling your story.  I thank you for having
10 the courage to bring your abuse to light.  Know that our
11 Diocese is here to walk with you on your path to healing.
12 While it is my prayer that the trust established through this
13 process will bring some level of restitution for the abuse each
14 of you survivors has endured, I realize that no amount of money
15 will ever make reparation for the horrific and sinful acts that
16 you experienced.
17         I am profoundly sorry for the pain that you have
18 endured.  My prayer is that in time, our actions will clearly
19 demonstrate our commitment to provide truly safe environments
20 for children, young adults, and vulnerable adults, and to
21 supporting each of you on your journey toward healing.
22         Thank you, Your Honor.
23         THE COURT:  Thank you.
24         This is a bankruptcy courtroom.  Very rarely am I
25 privileged to hear such human statements made on the record.

1  Both of the gentlemen who spoke demonstrate great bravery,

2  particularly Mr. Duggan.  Thank you, sir.  I think your bravery

3  and dedication is commendable, and you've been heard by a great

4  many people today.  I don't think it's very much of a stretch

5  to say you've made a difference in a great many lives.  So

6  thank you.

7           And to the Bishop, as well.  Important words.  They

8  don't have any legal impact on today's proceeding, but they're

9  no less important than the findings of fact that I make.

10  They're more important than any finding of fact or conclusion

11  of law I could utter.  It's part of the healing process.  What

12  the lawyers and the judges do here is a legal process, entirely

13  distinct, separate, clinical.  And at times, it allows us to

14  forget the human nature of what we do here today.  So I am very

15  grateful for the statements that were made.

16           Mr. Roth, is there anything further you'd like the

17  Court to consider?

18           MR. ROTH:  I have nothing further, Your Honor.

19           THE COURT:  Mr. Mr. Kugler?

20           MR. KUGLER:  Your Honor, it strikes me that it would

21  be appropriate to thank another individual who's been involved

22  in this case, and that's you.  You have guided this case with

23  fortitude, with wisdom, and with diligence that I know that has

24  greatly impacted and assisted the evolution of this case to get

25  to this point.  So on behalf of the survivors, I want to thank

1    you, as well.

2          THE COURT:  Thank you, sir.  Unnecessary, but kind

3    words are always welcome.

4          I have made all the requisite findings a fact.

5    Again, this is a joint plan submitted by both the Debtor and by

6    the Official Committee of Tort Claimants.  It has been a very

7    long road to get to this point, I know some counsel have been

8    involved in other cases, I am aware of other cases that are

9    currently pending in other states and jurisdictions that envy

10   this position from a legal standpoint.  And, again, the

11   professionals, as the UST has indicated, Mr. Schiller, are to

12   be congratulated for their hard work and the mediator, as well.

13   All the parties that were involved.

14         And so for the reasons stated on the record, I do

15   find that the plan is eligible for confirmation under 1129(a),

16   and the plan is hereby confirmed.

17         I wish there could be more fanfare for the moment,

18   but I believe the word that Mr. Duggan used is appropriate

19   here, it's bittersweet.  Nonetheless, it's a legal

20   accomplishment, and I congratulate the parties on achieving it.

21         And I wish all of the affected parties, the Diocese,

22   its individuals, parishes, the survivors, both known and

23   unknown, the best of luck in healing moving forward.

24         I've done all I can do in this case, and so if

25   there's nothing further, Mr. Kugler?

31

1          MR. KUGLER:  Nothing further.

2          THE COURT:  Mr. Roth?

3          MR. ROTH:  Nothing further, Your Honor; thank you.

4          THE COURT:  I thank you all.  We are adjourned.

5          MR. KUGLER:  Thank you.

6          THE COURT:  Good day.

7      (Whereupon, at 11:52 a.m., the hearing was adjourned.)

8

9                  CERTIFICATE OF TRANSCRIBER

10

11      I, KAREN HARTMANN, a certified Electronic Court

12  Transcriber, certify that the foregoing is a correct transcript

13  from the electronic sound recording of the proceedings in the

14  above-entitled matter.

15

16  *Karen Hartmann*

17

18  Karen Hartmann, AAERT CET 475  Date:  February 24, 2023

19  TRANSCRIPTS PLUS, INC.

20

21

22

23

24

25